UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE ESTATE OF ROY C. HAMMOND,

                           Plaintiff/Counterclaim
                           Defendant,

         v.

AARON FUCHS d/b/a Tuff City Records,
TUFAMERICA INC. d/b/a Swing Beats Songs
and FUNKY DELICACIES RECORDS,

                           Defendants/
                           Counterclaim
                           Plaintiffs/Third-Party
                           Plaintiffs,

         v.

SABRINA HAMMOND a/k/a Sabrina Mone
Hammond-Williams a/k/a Sabrina M. Hammond-
Williams, EDDIE B. HAMMOND, HENRY I.
CISCO, CAROLINA RECORDS
DISTRIBUTORS LLC, JOHNSON AND
HAMMOND MUSIC BMI, THE LATE ROY C.
HAMMOND SONGS AND MUSIC and ALAGA
RECORDS,

                           Third-Party
                           Defendants.

No. 21-cv-1121 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

The Estate of Roy. C. Hammond, a successful musician, brings this breach-of-contract

action against Defendants Aaron Fuchs, TufAmerica Inc. and Funky Delicacies Records

("Defendants"), alleging that they breached a 2001 settlement agreement by failing to pay

Hammond his share of licensing fees on several of his songs.  After suit was filed, Defendants

brought counterclaims for breach of the duty of good faith and fair dealing, unfair competition,

tortious interference and injunctive relief against the Estate; they also filed the same claims against several Third-Party Defendants affiliated with Hammond. Before the Court are three motions for summary judgment: the Estate's affirmative motion for partial summary judgment on its breach-of-contract claim against Defendants for nonpayment of royalties from 2019 to the present; Defendants' defensive motion for summary judgment against the Estate on its breach-of-contract claim in its entirety; and Defendants' affirmative motion for summary judgment on their counterclaims and third-party claims against the Estate and Third-Party Defendants (collectively, the "Hammond Parties"). The Estate also moves for attorney's fees in connection with its motion for partial summary judgment. For the reasons that follow, the Court grants the Estate's motion for partial summary judgment; grants in part Defendants' defensive motion for summary judgment as to Funky Delicacies Records but denies it as to the remainder; and denies Defendants' affirmative motion for summary judgment. It also denies Defendants' application for preliminary injunctive relief, as well as the Estate's motion for attorney's fees.

## BACKGROUND

The following facts are drawn from the parties' undisputed statements of material facts and accompanying exhibits and are undisputed unless otherwise noted. *See Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Roy C. Hammond was a soul musician who released a number of popular songs in the 1960s and 1970s, including "Impeach the President" and "Roy C.'s Theme." Dkt. No. 136 ("Defs. 56.1 Counter") ¶¶ 35–37. In 1982, Hammond entered into an agreement (the "1982 Agreement") that transferred the rights to the master components of "Impeach the President" to TufAmerica, *id.* ¶ 35, a record label founded and owned by Aaron Fuchs that also does business under the name Funky Delicacies Records, Dkt. No. 137-1 ("Hammond 56.1 Counter") ¶¶ 1–3.

According to Defendants, the 1982 Agreement barred Hammond from issuing other releases of "Impeach the President."  In 1993, however, Hammond authorized a new release (the "1993 Release") of "Impeach the President" and "Roy C.'s Theme," Dkt. No. 125 ("Defs. 56.1 Stmt.") ¶¶ 23–24, apparently working alongside a record label named Carolina Records Distributors LLC ("Carolina Records") that is owned by Hammond's daughter Sabrina Hammond-Williams, *id.* ¶¶ 3–4, 8; *see also* Dkt. No. 126 ("Fuchs Decl.") Ex. 4 (scans of vinyl issued in 1993).  The following year, Hammond and Carolina Records authorized another release of "Impeach the President" and "Roy C.'s Theme" in Japan (the "1994 Release").  Defs. 56.1 Stmt. ¶ 26; *see also* Fuchs Decl. Ex. 5. (eBay listing for CD issued in 1994).[1]  Defendants assert that both of these Releases violated the 1982 Agreement, which gave them the exclusive right to issue new releases of "Impeach the President."  Defs. 56.1 Stmt. ¶¶ 24, 26.

In the years that followed, Hammond and Fuchs had several disputes over the ownership of and licensing rights to "Impeach the President" and "Roy C.'s Theme," as well as the validity of the 1982 Agreement.  This culminated in a 2001 settlement (the "2001 Settlement Agreement") between Hammond and Fuchs, who signed in his individual capacity and on behalf of TufAmerica.  Hammond 56.1 Counter ¶ 14; *see also* Dkt. No. 130-5 ("2001 Settlement Agreement") at 24.  This Settlement Agreement purported to settle "all disputes between [Fuchs] on the one hand, and Hammond, on the other, for all actions, uses, licenses[,] payments, or failure to pay, that occurred prior to the date hereof in connection with the various agreements, compositions and masters discussed herein."  Hammond 56.1 Counter ¶ 92 (emphasis omitted).  It also definitively granted TufAmerica a 50% interest in the copyrights and sound recordings of both "Impeach the President"

---

[1] Although the Hammond Parties dispute that these releases occurred, they offer no evidence to rebut or discredit the scans and eBay listings offered by Defendants.  *See* Hammond 56.1 Counter ¶¶ 23, 25.

and "Roy C.'s Theme." Defs. 56.1 Stmt. ¶ 15.    TufAmerica also became the "exclusive administrator" of the copyrights to both songs, *id.* ¶ 16, and was obligated to pay Hammond a share of any licensing fees it earned on them, Dkt. No. 130-2 ("Hammond 56.1 Stmt.") ¶¶ 4–5. On that front, the 2001 Settlement Agreement set forth a specific payment schedule that required TufAmerica to pay Hammond royalties in the amount of 50% of all net income, for every quarter starting January 1, 2001.  *Id.* ¶ 6.

Over a decade later, in June 2014, Hammond and Carolina Records entered into an agreement with Starz Power Productions LLC, which purported to license it the right to use a Mary J. Blige song that sampled a portion of "Impeach the President" (the "2014 Starz License").  Defs. 56.1 Stmt. ¶ 27.  Defendants assert that the 2014 Starz License violated the terms of both the 1982 and 2001 Agreements.  *Id.* ¶ 28.  While the Hammond Parties admit that Hammond and Carolina Records issued the 2014 Starz License, they dispute that it violated either Agreement.  Hammond 56.1 Counter ¶ 28.

The parties then became entangled in multiple disputes beginning in 2017.  That year, Hammond sat for an interview with Red Bull Magazine (the "2017 Red Bull Interview") and made multiple comments about Fuchs that Defendants claim were false.   Defs. 56.1 Stmt. ¶ 29. Hammond stated, for instance, that he had signed a "five-year license" with Fuchs for "Impeach the President."  Defs. 56.1 Stmt. ¶ 29.  He went on to claim that Fuchs was to pay him $500 for the license, *id.*, but that the check bounced and Fuchs "didn't pay [him]," Fuchs Decl. Ex. 7 at 7. Hammond also explained that he eventually pursued legal action against Fuchs and received over $150,000.  *See id.* at 8.  The Hammond Parties admit that these statements occurred but deny that they were false.  Hammond 56.1 Counter ¶ 30.

The following year, on October 10, 2018, Fuchs emailed Hammond and stated that a royalty check would be sent to him by October 25, 2018. *Id.* ¶ 94. Fuchs sent another email on December 17, 2018 apologizing for being "late with your latest royalty payment," explaining that his "bookkeeper had to leave on personal business" before she could complete the paperwork. *Id.* ¶ 95. Hammond responded with a demand that Fuchs "[s]end it ASAP." *Id.* ¶ 96. A week later, an employee of Tuff City emailed Hammond apologizing for the delay and stating that the payment was being "rerouted" to his correct address. *Id.* ¶ 97. Hammond eventually received a check for $18,790.51, which included the memo line "All monies due through Dec. 2018." Defs. 56.1 Stmt. ¶¶ 17–18; Fuchs Decl. Ex. 3 at 2. He endorsed it with his signature and cashed it on December 31, 2018. Defs. 56.1 Stmt. ¶¶ 20–21; Fuchs Decl. Ex. 3 at 2.

That was apparently the last royalty check Hammond (or his Estate) received from Defendants. Starting in 2019, TufAmerica suspended all royalty payments, and ceased providing quarterly royalty reports. Defs. 56.1 Stmt. ¶ 36. Defendants claim that they did so after learning of the 1993 Release, the 1994 Release, the 2014 Starz License and the 2017 Red Bull Interview, which they say constituted material breaches of the 2001 Settlement Agreement that would excuse them from further performance. *Id.* ¶ 37. The Hammond Parties dispute that motivation, however, and claim that Fuchs decided to suspend payments "because of the lawsuits" that Third-Party Defendants later filed. Hammond 56.1 Counter ¶ 37.

The parties dispute how much Hammond would be owed in unpaid royalties under the 2001 Settlement Agreement. According to Defendants' accounting records, they accrued $346,030.32 in licensing income on Hammond's songs between 2019 and 2022. *See* Hammond 56.1 Counter ¶ 101; Dkt. No. 137-2 ("Hamilton Decl.") Ex. E. The Hammond Parties assert that Hammond is still owed $132,095.16 for his share of that income. *See* Hamilton Decl. Ex. E (listing

5

"Payee Balance" as $132,095.16).  Although Defendants stopped paying royalties to Hammond in 2019, Fuchs confirmed in his 2024 deposition that "Impeach the President continues to be utilized by [his company] and licensed out."  Hamilton Decl. Ex. B at 42–43.  The parties further dispute whether Hammond is owed any royalties for the period before 2019.  Defs. 56.1 Counter ¶ 13.

Several years later, in March 2020, Hammond's nephew Henry Cisco published a post about Fuchs on the website www.unkut.com (the "2020 Unkut Posting").  Defs. 56.1 Stmt. ¶ 31.  The post called Fuchs a "crook" and asserted that he had never "bought" any of Hammond's songs; it also claimed that Fuchs had "create[d] and manipulated some contracts with the aid of some crooked attorneys to make it appear as though (that) deal was made."  *Id.*  The Hammond Parties admit that these statements occurred, but insist that Cisco was acting independently and not on Hammond's behalf.  Hammond 56.1 Counter ¶ 31.

Hammond passed away in September 2020.  Defs. 56.1 Stmt. ¶ 33.  Eddie Hammond, his widow, became the personal representative of his Estate.  *Id.* ¶ 5–6.  At some point before his death, Hammond recorded a video repeating his earlier allegation that Fuchs had not paid him to license "Impeach the President" and "Roy C.'s Theme."  *Id.* ¶ 34.  Soon after his death, this video was posted on Facebook (the "2020 Facebook Video").  *Id.* ¶ 35.  While Defendants claim that the Estate or Third-Party Defendants posted the video, the Hammond Parties maintain that it was an unrelated man known as "Red Kelly."  Hammond 56.1 Counter ¶ 35.

In January 2021, Cisco sent an email to an attorney at Warner Music Group ("WMG"), a large record label with which TufAmerica regularly conducts business.  Defs. 56.1 Stmt. ¶ 38–44; Fuchs Decl. Ex. 12.  The email falsely identified Cisco as an "Assistant" to Hammond-Williams and Eddie Hammond, and copied Carolina Records as a recipient.  Defs. 56.1 Stmt. ¶¶ 45, 49.  It went on to accuse Fuchs of "Intellectual Property Theft," and asserted that he had been "illegal[ly]"

6

claiming to "own[]" the copyright to "Impeach the President." *Id.* ¶ 52.  The email further demanded that WMG pay "$10,000,000.00" and "return" the song "Impeach the President." *Id.* ¶ 54.  The Hammond Parties admit that Cisco sent this email but deny that he was acting on behalf of Hammond or any of the other Third-Party Defendants.  Hammond 56.1 Counter ¶¶ 52–56; *id.* ¶ 49 (asserting that Cisco "sent the email without first notifying the Estate, or the other Third[-]Party Defendants or obtaining their permission to do so").

The next month, on February 2, Cisco sent another email to the WMG attorney and several other employees there (collectively, the "2021 WMG Emails").  Defs. 56.1 Stmt. ¶ 57; Fuchs Decl. Ex. 13.  This email similarly accused WMG of intellectual property violations, including "unauthorized [s]ampling" of Hammond's songs, and increased its demand to "$15,000,000.00." Defs. 56.1 Stmt. ¶¶ 64–65.

According to Defendants, WMG reached out to them to express concern about Cisco's allegations.  *Id.* ¶ 67.  The Hammond Parties deny that Defendants have evidence to support this claim.  Hammond 56.1 Counter ¶ 67.  Hammond-Williams and Cisco eventually filed suit against WMG in February 2021, although they voluntarily dismissed that action two months later.  Defs. 56.1 Stmt. ¶¶ 71–75.

On February 3, 2021, Hammond-Williams and Cisco commenced this action pro se, asserting claims "jointly and on behalf of Roy C. Hammond, deceased."  Dkt. No. 1.  After the Court warned them about the limits on pro se representation of estates, Dkt. No. 20, Hammond-Williams retained counsel and filed an amended complaint in her own name, on behalf of the Estate and without Cisco as a party.  Dkt. No. 45 ("Complaint" or "Compl.").  The Complaint alleged that Defendants breached the 2001 Settlement Agreement by failing to pay Hammond the full extent of his royalties and similarly failing to provide accounting statements.  *Id.* ¶¶ 44–50.  It

also asserted copyright infringement counts against all Defendants, claiming that the Estate was the "exclusive owner" of the copyrights to "Impeach the President" and "Roy C.'s Theme," and that Defendants breached those rights by distributing, selling and licensing Hammond's songs without permission. *Id.* ¶¶ 51–57.

Defendants filed a motion to dismiss both claims, which the Court granted in part in an August 15, 2022 oral ruling. Dkt. No. 56. As the Court explained, the Estate had plausibly alleged that Defendants failed to pay Hammond (and later his Estate) the full extent of royalties owed under the 2001 Settlement Agreement. The Court agreed with Defendants, however, that the Estate had not stated a claim for copyright infringement, as the 2001 Settlement Agreement made TufAmerica a joint owner of "Impeach the President" and "Roy C.'s Theme."

Defendants filed an answer in February 2023, which also interposed counterclaims against the Estate and third-party claims against Hammond-Williams, Eddie Hammond, Cisco, Carolina Records, a business entity called Johnson and Hammond Music BMI, a business entity called The Late Roy C. Hammond Songs and Music and another business entity called Alaga Records (collectively, "Third-Party Defendants"). Dkt. No. 70. These counterclaims and third-party claims asserted four causes of action: breach of the duty of good faith and fair dealing, unfair competition, tortious interference with prospective economic advantage and injunctive relief. *Id.* ¶¶ 103–131. The parties then conducted discovery and, at the close, filed the motions for summary judgment now pending before the Court. Defendants move for summary judgment on the Estate's remaining claim for breach of contract against it, as well as for summary judgment in its favor on its counterclaims and third-party claims. Dkt. No. 124. The Estate, meanwhile, moves for partial summary judgment on its claim that Defendants breached the 2001 Settlement Agreement between

2019 through the present by suspending royalty payments to Hammond. Dkt. No. 130. It also moves for attorney's fees to the extent that it prevails on its partial summary judgment motion.

## LEGAL STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit'" and genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a material dispute exists, courts must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (internal quotation marks omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). "Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). "[E]vidence of the non-movant is to be believed," *id.* (quoting *Anderson*, 477 U.S. at 255), and the moving party bears the burden of showing that, despite that evidence against it, a reasonable jury would have to find in its favor, *see Anderson*, 477 U.S. at 256.

## DISCUSSION

The Court begins with the Estate's claim for breach of contract, on which the Estate and Defendants both filed opposing motions for summary judgment. It then addresses Defendants'

counterclaims and third-party claims against the Hammond Parties, before finishing with Defendants' motion for injunctive relief and the Estate's motion for attorney's fees.

## I.    The Estate's Claim for Breach of Contract

The Estate and Defendants both filed opposing motions for summary judgment on the Estate's breach-of-contract claim against Defendants. The Estate's motion is for partial summary judgment, and asserts that there is no genuine dispute that Defendants breached the 2001 Settlement Agreement between 2019 and the present, due to their suspension of royalty payments to Hammond. Dkt. No. 130 Ex. 1 ("Hammond Br.") at 4–5. In response, Defendants move for summary judgment against this claim in its entirety. Dkt. No. 128 ("Defs. Br.") at 12. They argue that the Estate's claim for royalties before 2019 was extinguished when Hammond accepted and cashed the royalty check in December 2018, which operated as an "accord and satisfaction" of any outstanding dispute. *Id.* at 14. As for the suspension of royalty payments beginning in 2019, Defendants insist that they had the lawful right to cease those payments, because they did so only after learning that Hammond had committed multiple material breaches of the 2001 Settlement Agreement himself. *Id.* at 12; Dkt. No. 133 ("Defs. Opp'n") at 13. In addition, they move for summary judgment on the claim against Fuchs and Funky Delicacies Records, on the grounds that neither was a party to the 2001 Settlement Agreement. Defs. Br. at 11. The Court starts with this latter argument, before turning to the parties' contrasting assertions over the pre-2019 and post-2019 royalty obligations.

### A.    Defendants' Motion as to Fuchs and Funky Delicacies Records

Defendants first argue that summary judgment should be granted on the Hammond Parties' breach-of-contract claims against Fuchs and Funky Delicacies Records. *See id.* They assert that neither of these parties was a signatory to the 2001 Settlement Agreement, which was signed by

only TufAmerica on Defendants' side.  In response, the Estate points out that Fuchs, the individual director of TufAmerica, signed the 2001 Settlement Agreement "in his individual capacity and on behalf of TufAmerica."  Dkt. No. 137 ("Hammond Opp'n") at 7 (quoting Hammond 56.1 Counter ¶ 14).  As for Funky Delicacies Records, the Estate argues that it is merely the fictitious trade name under which TufAmerica does business, so it should be held liable to the same extent as TufAmerica.  *See id.*

Starting with Fuchs, the Court agrees with the Estate:  He signed the 2001 Settlement Agreement "in his individual capacity" and is therefore personally liable for any breach.  "An agent who signs an agreement on behalf of a disclosed principal will not be held liable for its performance unless the agent clearly and explicitly intended to substitute his personal liability for that of his principal."  *Yellow Book of N.Y., Inc. v. Shelley*, 904 N.Y.S.2d 216, 217 (2d Dep't 2010); *see also Lansco Corp. v. N.Y. Brauser Realty Corp.*, 881 N.Y.S.2d 74, 76 (1st Dep't 2009) (agent who "signed in his individual capacity . . . would be personally liable for [principal's] breach").  In *Yellow Book*, for instance, the president of a corporate defendant signed under a signature line "which recited that the signatory was signing 'individually and for the Company.'"  904 N.Y.S.2d at 217.  Because this notation "clearly and explicitly" stated that the president was "agree[ing] to accept personal responsibility" for the company's breach, the court found him personally liable.  *Id.*

Fuchs is bound under this rule here.  On the signature page of the 2001 Settlement Agreement, the notation under his signature line stated "Aaron Fuchs, in his individual capacity and on behalf of TufAmerica, Inc."—a near replica of the language in *Yellow Book*.  *See* 2001 Settlement Agreement at 24.  By signing his name on that line, Fuchs agreed to accept personal

liability for any breach committed by TufAmerica.  Defendants' motion for summary judgment on this ground is therefore denied.

As for Funky Delicacies Records, the Court comes out the other way:  It is not a legal entity that can be sued, so it must be dismissed from the action.  While "all corporations" in New York have the right to sue and be sued, "a plaintiff cannot bring an action against a business operating under a trade name." *Thompson v. Jamaica Hosp. Med. Ctr.*, No. 13-cv-1896 (RWS), 2016 WL 4556905, at *5 (S.D.N.Y. Aug. 30, 2016) (quoting N.Y. Const. art. 10 § 4); *601 E. 226 St LLC v. U.S. Liab. Ins. Grp.*, No. 24-cv-722 (ALC), 2025 WL 934877, at *4 (S.D.N.Y. Mar. 27, 2025) ("[F]ictitious trade names . . . cannot be sued individually.").  A plaintiff who wishes to bring suit must instead name the actual legal entity behind the trade name.  *See Thompson*, 2016 WL 4556905, at *5 (discussing how plaintiffs may use discovery to identify the "proper legal entity").

Here, even the Estate concedes that "Funky is a fictitious business name that TufAmerica, Inc. does business as."  Dkt. No. 138 ("Hammond Reply") at 2–3; Hammond 56.1 Stmt. ¶ 1.  The Estate therefore may not bring claims against Funky Delicacies Records directly, as it is not a legal entity.  The Estate must instead sue the "proper legal entity" behind it, which it has already done here by suing TufAmerica.  *Thompson*, 2016 WL 4556905, at *5.  Defendants' motion for summary judgment on the claims against Funky Delicacies Records is therefore granted.  If the Estate wishes to amend the caption to identify TufAmerica as "d/b/a Funky Delicacies Records," then it may make a motion to that effect.  *See Morgan Art Found. Ltd. v. McKenzie*, No. 18-cv-4438 (AT) (BCM), 2021 WL 12101030, at *1 n.1 (S.D.N.Y. Oct. 4, 2021) (report and recommendation) (discussing instance where plaintiff permitted to amend caption to reflect defendant was "d/b/a" fictitious trade name).

### B.    Accord and Satisfaction of Royalty Payments Through 2018

Defendants also move for summary judgment on the Estate's breach-of-contract claim through the end of 2018.  They argue that Hammond accepted and cashed a check for $18,790.51, which qualified as an "accord and satisfaction" for any missing royalty payments through that date. Defs. Br. at 13–14.  While the Estate concedes that Hammond accepted that check, they dispute that it met the legal standard for accord and satisfaction.

This motion is denied, because there is a factual dispute as to whether Hammond's acceptance of the check was an accord and satisfaction under New York law.  "[W]hen there is a dispute as to the amount due and the debtor sends a check for less than the amount the creditor claims and expresses a clear intention that the check represents full payment of what is owed, the cashing or retention of the check by the creditor operates as an accord and satisfaction of the dispute."  *Gen. Sys. Corp. v. Newsnet, Inc.*, No. 84-cv-1658 (RLC), 1988 WL 34816, at *3 (S.D.N.Y. Apr. 7, 1988) (citing *Carlton Credit Corp. v. Atl. Refining Co.*, 208 N.Y.S.2d 622 (1st Dep't 1960)).  But this doctrine comes with two key requirements:  There must be (1) "a dispute as to the amount due," and (2) "knowing acceptance by the creditor of the lesser amount." *Landmark Ins. Co. v. Hensam Enters., Inc.*, No. 10-cv-4450 (GBD), 2011 WL 3366483, at *7 n.9 (S.D.N.Y. July 29, 2011).

Neither of these conditions has been established beyond dispute here.  It is true that Hammond accepted and cashed a check for $18,790.51 from TufAmerica in December 2018, and that the check's memo line said "All monies due through Dec. 2018."  *See* Hammond 56.1 Counter ¶¶ 17–22.  But it is far from clear that the parties were actively disputing the amount that Hammond was due; indeed, not one of the emails Defendants cite so much as hints that the parties disagreed as to the value of the forthcoming check.  *See* Hammond 56.1 Counter ¶ 95 (Fuchs email

apologizing that check was "late"); *id.* ¶ 96 (Hammond email demanding it be sent "ASAP"); *id.* ¶ 97 (TufAmerica employee apologizing that check had been sent to wrong address). Nor did any of these emails suggest that Hammond knew he was accepting less than he was legally owed. It may well be that Defendants sent Hammond a check for less than he was entitled, which he accepted without any awareness that he was being shorted. *In re Leckie's Estate*, 388 N.Y.S.2d 858, 864 (4th Dep't 1976) ("Unless there exists a genuine controversy concerning the amount due, mere payment by one party of a sum less than the whole of the claim and its acceptance by the other do not erect a foundation for such a settlement as may be deemed an accord and satisfaction."). And while it is also possible that Hammond intended for the check to satisfy all royalty payments due to him, no evidence establishes that fact beyond dispute. Defendants' motion for summary judgment on this ground is therefore denied.

### C.    Suspension of Payments in 2019

The parties also contest whether Defendants breached the 2001 Settlement Agreement starting in 2019, when they stopped making further royalty payments to Hammond following his acceptance of the check. Both sides filed opposing summary judgment motions on this point. The Hammond Parties affirmatively move for partial summary judgment on their breach-of-contract claim, asserting that there is no genuine dispute that Defendants suspended royalty payments and reports in 2019 and thereby breached the 2001 Settlement Agreement. Defendants insist, however, that they had the legal right to suspend payments because Hammond breached the 2001 Settlement Agreement first, specifically by authorizing the 1993 and 1994 Releases, issuing the 2014 Starz License and making the various statements that Fuchs had never paid him.

Defendants' argument implicates a well-established rule of contract law: If one party commits a material breach of a contract, then the other may suspend its own performance. *See*

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."). But there is a catch, and it is significant: If the non-breaching party wants to "stop[]" its performance, then it may not "continue receiving [the] benefits" of the contract. *ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991). In other words, when a counterparty commits a material breach, the non-breaching party has "two options": (1) cease performance entirely and stop accepting any benefits of the contract, or (2) "affirm[] the contract" by continuing to perform and accepting the attendant benefits. *Id.*; *see also Pickwick Commc'ns, Inc. v. Weinberg*, No. 91-cv-1642 (AGS), 1994 WL 620950, at *11 (S.D.N.Y. Nov. 8, 1994), *aff'd sub nom. Pickwick v. Weinberg*, 89 F.3d 825 (2d Cir. 1995) ("If the injured party chooses to go on [with the contract] he loses his right to terminate the contract because of the default." (quoting *Emigrant Indus. Sav. Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 144 (1943))).

This rule forecloses Defendants' argument here. Defendants admit that they "suspended making royalty payments and providing royalty reports to Roy Hammond in or around 2019." *See* Defs. 56.1 Stmt. ¶ 36. Yet they also admit that they continued to license out and collect fees on "Impeach the President" and "Roy C.'s Theme" *after* that date, as Fuchs confirmed at his deposition. *See* Hamilton Decl. Ex. B. at 42 (Fuchs confirming that "Impeach the President continues to be utilized by [his company] and licensed out."); *see also* Defs. 56.1 Counter ¶ 20 (objecting to this assertion without denying Fuchs' deposition statements or offering evidence to rebut them).[2] This is further confirmed by Defendants' own accounting records, which state that

---

[2] The Estate also argues that Defendants' collection of royalties is established by records subpoenaed from third-party Broadcast Media Inc. ("BMI"). *See* Hammond Br. at 6. The Court does not consider those royalty records in deciding this motion, as the Estate has not established that they are admissible for purposes of summary judgment. *See* Defs. 56.1 Counter ¶ 16 (objecting to these records as "hearsay"); *see also Tradax Energy, Inc. v. Cedar Petrochemicals,*

$346,030.32 was collected in profits and that the Estate is still owed some $132,095.16.  *See* Hamilton Decl. Ex. E at 1 (listing "Payee Balance" as $132,095.16 for "2019 Q1 – 2022 Q2" period).  There is thus no dispute:  By collecting fees on the licenses for themselves, Defendants continued to accept the benefits of the 2001 Settlement Agreement after they suspended their own performance.  Under clear New York law, they may not rely on Hammond's own breaches to resist summary judgment here.

Second Circuit precedent confirms this point, and on indistinguishable facts.  In *Marvel Entertainment Group*, Marvel Entertainment owned the copyright to Spiderman and other cartoon characters, much like Hammond and his songs here.  952 F.2d at 646.  It licensed the right to produce and exploit films featuring its characters to ARP Films, which did so for a period of years, collecting a portion of the proceeds for itself and distributing a share to Marvel.  *See id.* at 647.  Eventually, however, Marvel began to license distribution of its films on videocassette, and the parties came to a head over whether those licenses breached their agreement.  ARP soon stopped paying Marvel its share of the distribution proceeds, though it continued to license out the films and collect fees for itself—just like Defendants admit they did here.  *See id.*

Litigation ensued, and Marvel moved for partial summary judgment on its claim that ARP had breached their licensing agreement by suspending royalty payments.  *Id.* at 648.  As with the Estate, Marvel argued that that ARP could not suspend payments while still continuing to collect licensing fees for itself under the agreement.  The district court agreed, and so did the Second Circuit.  *See id.*  As the Circuit explained, once Marvel breached the contract, ARP had "two options:  (1) it could have stopped performance and sued for total breach; or (2) it could have

---

*Inc.*, 317 F. Supp. 2d 373, 379 (S.D.N.Y. 2004) ("At the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge that the documents were admissible business records." (alterations and internal quotation marks omitted)).

affirmed the contract by continuing to perform while suing in partial breach." *Id.* at 649. What it could *not* do was stop paying Marvel while continuing to collect licensing fees for itself. As the court summed up, "ARP's refusal to perform its end of the bargain, by making payments and providing reports, was impermissible." *Id.* ("ARP's decision to continue receiving benefits pursuant to the 1976 Agreement was tantamount to an election to affirm the contract.").

The same is true here, and for the exact same reasons. Even if Hammond's prior conduct was a material breach, Defendants could not "continue to receive the benefits" of the 2001 Settlement Agreement while also "refus[ing] to perform their end of the bargain by making the requisite licensing payments." *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1196–97 (S.D.N.Y. 1994) (citing *Marvel Ent.*, 952 F.2d at 649); *see also Estate of John Lennon v. Leggoons, Inc.*, No. 95-cv-8872 (HB), 1997 WL 346733, at *1 (S.D.N.Y. June 23, 1997) ("A party that elects to continue to receive benefits under a contract (in this case, the right to sell Lennon merchandise) cannot unilaterally suspend its performance (in this case, payment of a guaranteed royalty) as a means of self-help to remedy a breach by the other party."). Because Defendants do not dispute that they continued to collect licensing fees on "Impeach the President" and "Roy C.'s Theme," there is no genuine dispute that they breached the 2001 Settlement Agreement by suspending payment to Hammond in 2019. *See Marvel Ent.*, 952 F.2d at 649 (affirming grant of summary judgment on similar facts); *Pickwick Commc'ns*, 1994 WL 620950, at *11 (same).

The Court thus grants the Estate's motion for partial summary judgment as to Defendants' breach of the 2001 Settlement Agreement by suspending royalty payments in 2019. For the same reasons, it denies Defendants' motion for summary judgment on this claim. It reserves the issue of damages for trial, as well as whether Defendants breached the 2001 Settlement Agreement by failing to pay Hammond royalties due before 2019, as the Estate agrees is appropriate here. *See*

Hammond Reply at 5 (acknowledging that there remain "factual dispute[s]" over whether Defendants owe royalties before 2019 and the extent of any royalties owed after 2019).

## II.    Defendants' Counterclaims

Defendants also affirmatively move for summary judgment on the four counterclaims they asserted against the Hammond Parties: breach of the duty of good faith and fair dealing, unfair competition, tortious interference with prospective economic opportunity and injunctive relief.

As a preliminary matter, Defendants argue that they are entitled to summary judgment against Third-Party Defendants, because they did not file an opposition to Defendants' motion for summary judgment. *See* Dkt. No. 139 ("Defs. Reply") at 3. According to Defendants, only the *Estate* filed a response, which was made only for itself, and not on behalf of Third-Party Defendants. This oversight, Defendants maintain, entitles them to summary judgment against the non-responding parties by default.

The Court disagrees. Given the surrounding context, it is apparent that the opposition papers were submitted by the Estate as well as Third-Party Defendants. All of these parties are represented by the same counsel, so it is not surprising that they would file a single set of opposition materials. Moreover, this opposition rebutted Defendants' arguments as to Third-Party Defendants, which further indicates it was filed on their behalf. *See, e.g.*, Hammond Opp'n at 19 (arguing that Cisco cannot be liable for unfair competition because he is not a competitor); *id.* at 20 (same for Hammond-Williams); *id.* at 22 (arguing that Cisco is not liable for tortious interference because he did not act "solely to harm" Defendants). Not only that, even Defendants' own filings acknowledged that the opposition was filed on behalf of all the Hammond Parties, as shown by the title that Defendants gave their Rule 56.1 Counterstatement: "Defendants' Reponses to Plaintiff *and Third-Party Defendants'* Rule 56.1 Statement of Undisputed Material Facts."

Defs. Rule 56.1 Counter at 1 (emphasis added).  And were there any doubt, counsel for Third-Party Defendants submitted a sur-reply letter confirming that the opposition papers were filed on behalf of Third-Party Defendants as well as the Estate.  *See* Dkt. No. 144.  The Court thus accepts the opposition papers as filed on behalf of both Hammond and Third-Party Defendants, and addresses each of the counterclaims in turn.

### A.    Breach of the Duty of Good Faith and Fair Dealing

Defendants first assert that they are entitled to summary judgment on their claim that the Hammond Parties breached the duty of good faith and fair dealing implied in the 2001 Settlement Agreement.  *See* Defs. Br. at 16.  They allege that the Hammond Parties breached that duty in myriad ways, including the 1993 and 1994 Releases, 2014 Starz License, 2017 Red Bull Interview, 2020 Unkut Posting, 2020 Facebook Video and 2021 WMG Emails.  The Hammond Parties argue in response that several of these acts are barred by the statute of limitations, that several of them were not parties to the 2001 Settlement Agreement and that fact disputes otherwise preclude summary judgment at this time.

"Under New York law, 'implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included.'"  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (alterations omitted) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)).  "[N]either party to a contract shall do anything [that] has the effect of destroying or injuring the right of the other party to receive the fruits of the contract," or to violate the party's "presumed intentions or reasonable expectations."  *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).  "[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and ordinarily is a question of fact to be determined

by the jury or other finder of fact." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (internal quotation marks omitted); *Pernet v. Peabody Eng'g Corp.*, 248 N.Y.S.2d 132, 135 (1st Dep't 1964) (same).

At the outset, the Hammond Parties are correct that several of the alleged breaches fall outside the statute of limitations and cannot form the basis of Defendants' claims. In New York, "the cause of action alleging breach of the implied covenant of good faith and fair dealing . . . is governed by a six-year statute of limitations." *P.S. Fin., LLC v. Eureka Woodworks, Inc.*, 184 N.Y.S.3d 114, 137 (2d Dep't 2023). Defendants did not assert these counterclaims until 2023, which places the 1993 Release, 1994 Release and 2014 Starz License well outside the limitations period.

Nor are Defendants entitled to summary judgment based on the 2017 Red Bull Interview, during which Hammond stated that he had signed a five-year license with Fuchs for $500, and that the check bounced. As a threshold matter, Defendants offer little support for their argument that these statements were a breach of the implied covenant. They cite no cases whatsoever and offer only an empty hypothesis that perhaps Hammond had "defamed" them and thus "damaged the fundamental value of the 2001 Settlement Agreement." Defs. Br. at 17. But even assuming that defaming a counterparty can qualify as a breach of the implied covenant, there are "genuine disputes of material fact" as to whether Hammond's statements during the 2017 Red Bull Interview rose to that level—which precludes summary judgment here. *See Beach v. HSBC Bank USA, N.A.*, No. 17-cv-5153 (WHP), 2018 WL 3996931, at *10 (S.D.N.Y. Aug. 21, 2018) (denying summary judgment on claim for breach of implied covenant). While the Estate admits that Hammond stated that he had signed a five-year license with Fuchs for $500 that was not paid, it denies that those statements were false, and Defendants offer no evidence to prove otherwise. *See* Hammond 56.1

20

Counter ¶¶ 29–30. Indeed, the original 1982 Agreement between Hammond and Fuchs was for $500 and does not appear to mention a term on its face. *See* Fuchs Decl. Ex. 1 ("1982 Agreement") at 2 ("five hundred dollars"). Moreover, Hammond and Fuchs appear to have reached another agreement in 1988—about five years after their original contract—which could also explain Hammond's "five year" comment. *See* 2001 Settlement Agreement ¶ 35 (referencing "agreement dated March 22, 1988"); *see also* Dkt. No. 126-1 at 5 (scan of 1988 agreement).

As for payment and the bounced check, Defendants point to no evidence establishing beyond dispute whether those statements were false; moreover, Hammond clarified later in the interview that he eventually received more than $150,000 from Fuchs. *See* Fuchs Decl. Ex. 7 at 8 (discussing payments after legal disputes of $100,000, $40,000 and $32,500). Hammond's comments about not being paid may thus have meant that he had not been paid to the full extent he was entitled, not that he was never paid anything at all. In any event, even if Hammond's statements were false, whether Hammond knew or should have known of their falsity would still be a fact question for the jury. *See* Defs. Reply at 13 (suggesting that "malice" would need to be proven). In short, even if Defendants' defamation theory of the implied covenant is a viable one, there are still genuine factual disputes that preclude summary judgment on it as applied to the 2017 Red Bull Interview. *See Tractebel Energy*, 487 F.3d at 98 ("[W]hether particular conduct violates . . . the duty of good faith . . . is ordinarily a question of fact to be determined by the jury." (internal quotation marks omitted)). The same is true of Hammond's 2020 Facebook Video, in which he apparently repeated his allegation that Fuchs had not paid him—an assertion that Defendants have not conclusively disproven at this point.[3]

---

[3] The Hammond Parties have also asserted that the Video was posted not by Hammond but by an "unrelated party" under the name "Red Kelly." *See* Fuchs Decl. Ex. 10 at 18 (Facebook video of Hammond posted from account named "Red Kelly"). If that assertion is true, which is plausible at this point, it would further call into question whether

Defendants also speculate, again without citing cases, that Cisco's 2020 Unkut Posting and 2021 WMG Emails (on which Hammond-Williams was copied) breached the implied covenant in the 2001 Settlement Agreement, because they made defamatory statements about Fuchs.  *See* Defs. Br. at 16–17.  But neither Cisco nor Hammond-Williams was a signatory to the 2001 Settlement Agreement, so they cannot be sued for breaching the duty of good faith implied in it.  *See Duration Mun. Fund, L.P. v. J.P. Morgan Sec. Inc.*, 908 N.Y.S.2d 684, 685 (1st Dep't 2010) ("A cause of action based upon a breach of a covenant of good faith and fair dealing requires a contractual obligation between the parties.").  Defendants also suggest that Cisco and Hammond-Williams were acting on behalf of the Estate, which could make it liable for their conduct.  But their actions could be imputed to the Estate only if they sent the 2021 WMG Emails on its behalf, as opposed to in their individual capacities.  *See Com. Trading Co., Inc. v. Tucker*, 437 N.Y.S.2d 86, 87 (1st Dep't 1981) (finding that defendant's "admission . . . could not bind the estate since the admission had been made by him in his individual capacity"); *In re Estate of Neustein*, 960 N.Y.S.2d 341, at *3 (Sup. Ct. Sept. 13, 2010) ("The Court finds his actions were taken in his individual capacity and not as the fiduciary of the Estate.").  Here, the Estate disputes whether Cisco and Hammond-Williams were acting on its behalf when they sent the disputed emails, which leaves the Court with another open question of fact that cannot be resolved at summary judgment.  *See Rudnitsky v. Robbins*, 594 N.Y.S.2d 354, 356 (2d Dep't 1993) (denying summary judgment because "there is a question of fact as to whether [defendant] acted for himself alone or on behalf of himself and others" in representative capacity).

---

Hammond's conduct breached the implied covenant, since he may have only made the challenged statements in private—not in a public channel that could harm Defendants' contractual interests.

Accordingly, while Defendants have pointed to multiple ways in which the Hammond Parties may have breached the implied covenant, there are various fact disputes that prevent the Court from finding any breach as a matter of law. Defendants' motion for summary judgment on this claim is denied.

### B.    Unfair Competition

Defendants also move for summary judgment on their unfair competition claims against the Hammond Parties, asserting that there is no genuine dispute that the 2021 WMG Emails constituted unfair competition under New York law. *See* Defs. Br. at 18. According to Defendants, the Estate and Third-Party Defendants committed unfair competition when Cisco and Hammond-Williams sent the 2021 Emails to WMG, which "lied about and defamed Defendants, and demanded payment of $10 million and then $15 million." *Id.* at 19. The Emails specifically accused Defendants of "Intellectual Property Theft" and asserted that "there was never any sale of the rights or the ownership of ["Impeach the President"] to them. Defs. 56.1 Stmt. ¶ 52.

Those arguments also fail. Starting with the Estate, it could be liable for the 2021 WMG Emails only if Cisco and Hammond-Williams were acting on its behalf when sending the emails. As already explained, that fact is genuinely disputed at this point, so Defendants may not obtain summary judgment against the Estate on this claim.

Nor can Defendants obtain summary judgment against Third-Party Defendants in their individual capacities. As an initial matter, it is not entirely clear what theory of unfair competition Defendants rely on, as they do not cite any cases involving the sort of defamation-style unfair competition alleged here. *See* Defs. Br. at 18 (citing cases that involve "misappropriat(ing) for the commercial advantage of one person a benefit or property right belonging to another" (alterations and internal quotation marks omitted)). Given Defendants' emphasis on how they were

"defamed," *id.* at 19, the Court's best guess is that Defendants are alleging a claim for what is known as "unfair competition by disparagement." *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003); *see also Payrolls & Tabulating, Inc. v. Sperry Rand Corp.*, 257 N.Y.S.2d 884, 886 (1st Dep't 1965) (describing this tort). This is a "distinct subcategory" of unfair competition. *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 277 (S.D.N.Y. 2003). Also called "injurious falsehood," this cause of action "may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage." *Diehl & Sons, Inc. v. Int'l Harvester Co.*, 445 F. Supp. 282, 291 (E.D.N.Y. 1978) (quoting William Prosser, Torts § 128, at 919–20 (4th ed. 1971) ("Prosser on Torts")). In short, it is "a claim for defamation of another's business." *Boule*, 328 F.3d at 94.

"The gravamen of this tort is the utterance of an untrue statement about the plaintiff's business or property which induces others to refrain from dealing with him, or otherwise deprives him of prospective economic advantage." *Bivas v. State*, 411 N.Y.S.2d 854, 858 (Ct. Cl. 1978) (citing Prosser on Torts, ch. 25)). Of particular significance here, however, this requires the plaintiff to show the defendant acted with "malice, comprising either ill will, scienter or deliberate falsification." *Id.*; *see also Payrolls & Tabulating Inc.*, 257 N.Y.S.2d at 886 (requiring "the assertion, on the part of the defendant, of an unqualified falsehood, with a fraudulent intent as to a present or existing fact" (internal quotation marks omitted)).[4]

---

[4] Although the Hammond Parties assert that "special damages" must also be proven, Hammond Opp'n at 20, the Court disagrees. Special damages are required only when "the statement . . . denigrat[es] the quality of the business' goods or services." *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670–71 (1981). By contrast, when the "statement impugns the basic integrity or creditworthiness of a business," special damages need not be proven, as it is akin to defamation per se. *Id.* at 670; *see also Gucci Am.*, 277 F. Supp. 2d at 278 ("Such a claim may be actionable

This malice requirement precludes summary judgment here.  It is true that Third-Party Defendants do not dispute that the statements about "Intellectual Property Theft" and Fuchs' ownership of the copyrights were false.  Hammond 56.1 Counter ¶ 53 (disputing only that Cisco was acting on behalf or with permission of the Estate or other Third-Party Defendants).  But Defendants must also show that Cisco and the other Third-Party Defendants acted with "malice"— which is a question of fact typically reserved for the jury.  *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 243 n.5 (2d Cir. 2017) ("It is the settled law of this state, that, to support an action for defamation, malice is essential; and whether there is malice in the publication, belongs to the jury to decide as a matter of fact." (quoting *Root v. King*, 7 Cow. 613, 625 (N.Y. 1827) (alterations omitted))).  While it is certainly possible that Cisco and the other Third-Party Defendants acted with malice when making the admittedly false statements in the 2021 WMG Emails, Defendants have not proven that beyond dispute.[5]  *See Raffa v. Shilbury*, 263 N.Y.S.2d 876, 877–78 (3d Dep't 1965) (denying summary judgment because malice was in dispute).  Their summary judgment motion must therefore be denied.

## C.    Tortious Interference

Next, Defendants move for summary judgment on their claims that the Hammond Parties tortiously interfered with TufAmerica's prospective economic opportunity.  *See* Defs. Br. at 19. Under New York law, a plaintiff bringing this claim must prove that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, fair, or improper

---

per se, meaning special damages need not be asserted, but only if the false disparagement directly maligns the *owner* of the goods." (internal quotation marks omitted)).

[5] At this stage, it is also not clear which of Third-Party Defendants acted in concert with Cisco when drafting and sending the 2021 WMG Emails, which would independently preclude a finding of summary judgment against them at this stage.  *See* Hammond 56.1 Counter ¶ 52 (asserting that "Cisco wrote the complete contents of the email without first notifying the Estate or other Third[-]Party Defendants or obtaining their permission to do so.").

means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). "In all but the most egregious circumstances, 'dishonest, unfair, or improper means' must amount to misconduct that constitutes either a crime or an independent tort." *PKG Grp., LLC v. Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. Aug. 29, 2006) (quoting *Carvel Corp.*, 350 F.3d at 17).

Defendants assert that the Hammond Parties satisfied the "wrongful means" element by way of the various torts discussed above, including breaches of the 2001 Settlement Agreement, breaches of the duty of good faith and fair dealing and defamation or disparagement. *See* Defs. Br. at 21. But as already explained, there are genuine fact disputes as to whether the Hammond Parties engaged in those torts. Because proving those wrongful acts is a necessary component of Defendants' tortious interference claims, their motion for summary judgment must be denied, for the same reasons.[6]

### D.    Injunctive Relief

Finally, the Court denies Defendants' application for a preliminary injunction. "In general, a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (alterations and internal quotation marks omitted). "These requirements are demanding, for a preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Id.* (alterations and internal quotation marks omitted).

---

[6] Because these fact disputes preclude summary judgment, the Court need not address the Estate and Third-Party Defendants' other arguments against these claims. *See* Hammond Opp'n at 20–22 (raising issues including statute of limitations and relationship harm).

Defendants fall well short of those requirements here. As already discussed, there are multiple open fact disputes surrounding its various claims, and the Court cannot say that at this stage that they are "likely" to succeed on them. *Id.* Nor have Defendants shown a risk of irreparable harm, given that "a monetary award" would appear to supply "adequate compensation" for their claimed injuries. *Tom Doherty Assocs., Inc. v. Saban Ent.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks omitted). Defendants also waited too long to request this relief, given that the last bad acts of which they complain are the 2021 WMG Emails, which were sent four years ago. *See Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192 (S.D.N.Y. 1990) (finding lack of irreparable harm and denying preliminary injunction where plaintiff "waited over seven months" after offending conduct to make motion).

## III. Attorney's Fees

The Estate also moves for attorney's fees under the 2001 Settlement Agreement, which authorizes the "prevailing party" to recover "reasonable attorney's fees" incurred in bringing any action "to enforce th[e] Agreement." *See* 2001 Settlement Agreement ¶ 78. "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear." *NetJets Aviation, Inc., v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008). Determining who is the "prevailing party . . . requires an initial consideration of the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope." *Excelsior 57th Corp. v. Winters*, 641 N.Y.S.2d 675, 676 (1st Dep't 1996). Courts in New York have often found, however, that "a determination of prevailing party status must await the final resolution of the action," in order to assess how much of the relief sought was ultimately obtained. *Andreas v. 186 Tenants Corp.*, 174 N.Y.S.3d 58, 60 (1st Dep't 2022).

The Estate's motion for attorney's fees is premature here. Although the Court has found it entitled to partial summary judgment on its breach-of-contract claim for unpaid royalties from 2019 to now, it is still seeking relief for unpaid monies before that date. And Defendants have also brought counterclaims for breaching the covenant of good faith implicit in the 2001 Settlement Agreement, which have yet to be resolved. It is therefore not clear whether the Estate will ultimately obtain much of the relief it sought, or even whether it will end up liable for breaches of its own. Accordingly, the Court cannot conclude that the Estate is the "prevailing party" at this early hour, and denies this motion without prejudice.

## CONCLUSION

For these reasons, the Estate's motion for partial summary judgment on its breach-of-contract claim from 2019 to present is granted. Defendants' motion for summary judgment on their counterclaims and third-party claims are denied, as is its application for a preliminary injunction. The Estate's motion for attorney's fees is also denied, albeit without prejudice. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 124 and 130.

SO ORDERED.

Dated:     September 19, 2025
           New York, New York

Ronnie Abrams
United States District Judge

28